UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

KT GROUP LIMITED,

             Plaintiff,

      v.

NCR CORPORATION,

             Defendant.

**MEMORANDUM
OPINION & ORDER**

15 Civ. 7482 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

        Beginning in July 2013, Plaintiff KT Group Limited and Defendant NCR
Corporation worked to design, manufacture, and deliver a pilot of two versions ("Version 1" and
"Version 2") of a supermarket self-checkout kiosk product for NCR's client Tesco. The parties
entered into two non-disclosure agreements ("NDAs"). The first NDA concerned the Version 1
kiosk, while the second NDA concerned the Version 2 kiosk. These NDAs governed the
exchange of confidential information concerning the self-checkout kiosk pilot project. Pursuant
to the NDAs, Plaintiff KT provided certain "production drawings" to NCR. These "production
drawings" consisted of three-dimensional, computer-aided design ("3D CAD") files.

        In October 2014, NCR issued to KT and six other potential bidders a request for
quote ("RFQ") for the large-scale manufacture of a component of the Version 2 kiosk. The RFQ
references certain two-dimensional production drawings of the Version 2 kiosk. KT submitted a
bid, but in November 2014 NCR selected a Chinese firm – Karrie – to manufacture the
component. Karrie had provided third-party manufacturing for NCR and KT in connection with
the self-checkout kiosk pilot project. In July 2015, KT learned that NCR had awarded the
contract for producing the kiosk components to Karrie, and KT suspected that NCR had provided
Karrie with KT's production drawings.

The Complaint was filed on September 22, 2015, and asserts claims for breach of contract, misappropriation of trade secrets, violation of the Lanham Act, 15 U.S.C. §1125(a), and common law unfair competition. (Cmplt. (Dkt. No. 1)) On September 29, 2018, this Court granted NCR summary judgment on KT's Lanham Act and misappropriation of trade secrets claims. (See Order (Dkt. No. 72))

On December 18, 2018, the case proceeded to trial on KT's breach of contract and common law unfair competition claims.[1] On January 4, 2019, the jury returned a verdict in favor of KT, finding that NCR had breached one or more of the NDAs, and that NCR had engaged in unfair competition. The jury awarded KT $50,000 on its unfair competition claim, but concluded that KT had not proven damages on its breach of contract claim. (Verdict (Dkt. No. 149))

On January 25, 2019, NCR moved for judgment as a matter of law, pursuant to Fed. R. Civ. P. 50(b). (Mot. (Dkt. No. 157)) NCR argues, inter alia, that it is entitled to judgment as a matter of law on (1) KT's breach of contract claim, because the jury found that KT had not suffered damages; (2) KT's unfair competition claim, because that claim is duplicative of KT's breach of contract claim; (3) both claims, because the evidence is insufficient; (4) KT's claim for damages on its unfair competition claim; and (5) both claims, because NCR acted in furtherance of the "Authorized Purpose" set forth in the NDAs.[2] (Def. Br. (Dkt. No. 158))

---

[1] At the close of Plaintiff's case, NCR moved for judgment as a matter of law. (See Jan. 3, 2019 Trial Tr. ("Tr.") (Dkt. No. 169) at 3-6)

[2] NCR also argues in a footnote that KT's claims fail because – pursuant to certain terms and conditions set forth in purchase orders NCR sent to KT – NCR owns the KT production drawings at issue. (Def. Br. (Dkt. No. 158) at 10 n.2) As the Court explained during the January 2, 2019 charge conference – and as described more fully below – the purchase orders' terms and conditions are inconsistent with the NDAs, and would only govern if the purchase orders had somehow modified the NDAs. No reasonable jury could have found that the parties intended that the purchase orders modify the NDAs, however. (Charge Conference Tr. (Dkt. No. 167) at

2

For the reasons stated below, NCR's motion will be denied in its entirety.

## BACKGROUND

## I.    THE EVIDENCE AT TRIAL

During the six-day trial, KT called Kenneth Larsen, its chief executive officer; Steev Jones, its technical director; and Dusty Lutz, the NCR employee in charge of the kiosk project. NCR re-called Lutz during the defense case, but called no other witnesses.

### A.    The Tesco London Kiosk Project

NCR – a Fortune 500 company established in 1884 – is a leader in the market for self-checkout products, holding a 60% global market share. The company's U.S. clients include Walmart, Home Depot, and Safeway. (Dec. 18, 2018 Tr. (Dkt. No. 159) at 65, 68-69; Dec. 21, 2018 Tr. (Dkt. No. 165) at 142-43)[3]

For the past twenty years, Dusty Lutz has "le[]d the product development team responsible for the evolution of [NCR's] self[-]checkout offerings." NCR installed its first self-checkout unit in 1998, and Lutz has since overseen six generations of self-checkout kiosks. (Dec. 18, 2018 Tr. (Dkt. No. 159) at 64, 67, 73)

Tesco – a supermarket chain that is "one of the biggest retail[e]rs in Britain" – is an NCR client. NCR has supplied all of the 10,000 self-checkout kiosks installed in Tesco's stores. (Dec. 20, 2018 Tr. (Dkt. No. 163) at 184; Dec. 18, 2018 Tr. (Dkt. No. 159) at 69)  In 2013, Tesco informed NCR that it was seeking a new, sleeker, credit card-only self-checkout

---

20-21) Accordingly, to the extent that NCR seeks judgment as a matter of law on this ground, its motion is denied.

[3] The page numbers of documents referenced in this Opinion & Order correspond to the page numbers designated by this District's Electronic Case Filing system.

kiosk. (Dec. 18, 2018 Tr. (Dkt. No. 159) at 76, 82-83) NCR did not then have a model that met Tesco's requirements.

KT Group is a small Hong Kong-based self-service kiosk company that Kenneth Larsen found in 2005. In 2013, an NCR sales employee mentioned to Larsen that NCR "w[as] working on something very interesting with a large grocery company in the U.K." involving a self-service checkout machine, and asked Larsen whether KT had a kiosk product suitable to show Tesco at an upcoming Tesco technology fair. KT showed NCR its "Simplicity" model kiosk. NCR purchased the Simplicity unit, asking KT to deliver it in nine days. KT met that deadline. (Dec. 18, 2018 Tr. (Dkt. No. 159) at 83; Dec. 20, 2018 Tr. (Dkt. No. 163) at 184)

The exhibition of KT's Simplicity kiosk at Tesco's technology fair led to further discussions between NCR and Tesco about a new model self-checkout kiosk. Lutz and NCR's "Consumer Experience Group" – based in Dundee, Scotland – held a collaborative session with Tesco at Tesco's headquarters, after which NCR personnel sketched designs for what would become the Version 1 kiosk. (Dec. 18, 2018 Tr. (Dkt. No. 159) at 84; Dec. 21, 2018 Tr. (Dkt. No. 165) at 154) NCR presented its final version of these drawings to Tesco's Chief Information Officer in July 2013. Tesco approved the design, and requested that NCR deliver prototypes of the Version 1 kiosk to three of Tesco's stores by September 2013. (Dec. 18, 2018 Tr. (Dkt. No. 159) at 87; Dec. 21, 2018 Tr. (Dkt. No. 165) at 173-74; see also DX M)

NCR typically handles kiosk production for Tesco in-house. Lutz explained, however, that "[a] typical program of th[e] complexity [of the Version 1 kiosk] w[ould] be on the order of nine to fifteen months." "In using [NCR's] standard processes, it would not have been feasible to go from a design concept in July to a store installation . . . by September." (Dec. 18, 2018 Tr. (Dkt. No. 159) at 87; Dec. 21, 2018 Tr. (Dkt. No. 165) at 174-76)

NCR had been impressed with how quickly KT had produced a unit of the Simplicity kiosk. "[U]nderst[anding] [that] KT was a well[-]respected . . . kiosk manufacturer and had capabilities for doing rapid prototyping," and believing that KT Group could "go find the right manufacturer to fabricate the metal [and] do the assembly," Lutz contacted KT in July 2013 about "do[ing] the rapid prototyping to help [NCR] install [kiosks in] three [Tesco] stores that September. . . ." (Dec. 18, 2018 Tr. (Dkt. No. 159) at 87; Dec. 21, 2018 Tr. (Dkt. No. 165) at 178, 180-81; see also Dec. 20, 2018 Tr. (Dkt. No. 163) at 187-88) (Larsen testifying that during "the last few years before [KT] got introduced to NCR, [KT] w[as] getting a reputation for being able to build . . . custom projects, where one does something specific or [does] special designs")) Lutz initially asked KT to produce fifteen units of the Version 1 kiosk. He later increased the order to thirty units. (Dec. 20, 2018 Tr. (Dkt. No. 163) at 192)

According to Lutz, NCR's Dundee group then produced computer-aided design files, or "3D CAD" files, for the Version I kiosk. 3D CAD files show designs in three-dimensional form, and permit the user to manipulate the visual components of a design, view the design from different angles, and view a design's internal components. (See, e.g., Dec. 20, 2018 Tr. (Dkt. No. 163) at 18, 20, 35) Lutz testified that NCR's design files constituted "a very quick

industrial design"[4] that NCR then "tossed . . . to KT to do the rapid prototyping."[5] (Jan. 3, 2019

Tr. (Dkt. No. 169) at 37))  KT was tasked with creating 3D CAD drawings – sometimes

described by Lutz as "detailed production drawings" – from which a manufacturer could actually

produce the kiosks.  According to Lutz, however, the 3D CAD detailed production drawings that

KT was asked to produce were "based on the NCR design contained within the CAD model that

[NCR's] industrial design team in Dundee, Scotland, created."  (Dec. 19, 2018 Tr. (Dkt. No.

161) at 173-74)

---

[4]  The witnesses at trial did not consistently and clearly distinguish between the various kinds of
"drawings" or "designs" created in connection with the Version 1 and Version 2 kiosks.  It
became clear, however, that an "industrial design" does not contain sufficient detail to permit a
manufacturer to produce a product such as the self-checkout kiosk in question.  "Production
drawings" – which can be in the form of 3D CAD files, or on paper in two-dimensional form –
are necessary for this purpose.  (See, e.g., Dec. 21, 2018 Tr. (Dkt. No. 65) at 175 (Lutz, asked
"[w]hat is involved in turning drawings into real products," testifying that "[d]epending on the
depth and detail in the industrial design . . . it involves . . . [the] creat[ion] [of] production
drawings and then deciding who will actually build the unit"); id. at 181 (Lutz wanted KT "to
create the production drawings from [NCR's] industrial design, and then go find the right
manufacturer to . . . do the assembly"); Jan. 3, 2019 Tr. (Dkt. No. 169) at 67 (Lutz referring to a
two-dimensional drawing for a particular kiosk component as a "production drawing" that was
sent to potential suppliers to bid on their manufacture); Dec. 19, 2018 Tr. (Dkt. No. 161) at 177-
78) ("[KT] produced the productions drawings . . . they had their own engineers that produced a
3D CAD model that allowed them to produce the [kiosk] prototypes. . . ."); id. at 120 ("The KT
CAD files represent the production drawings of the NCR designs . . . .")  The parties also used
"mechanical drawing" or "3D mechanical drawing" synonymously with "3D CAD file."  (See,
e.g., PX 2 (referring to "mechanical and 3D drawings"); Jan. 3, 2019 Tr. (Dkt. No. 169) at 85-86
(Q: . . . [W]hat you call the NCR [two-dimensional] production drawings, those were derived
from KT's 3D mechanical drawings, were they not?  A:  There were not derived from that, no. . .
. I know because I have looked at the KT 3D CAD files and I've looked at the NCR production
drawings, and I clearly see major differences in those drawings.")

[5]  Lutz described "rapid prototyping" as a process in which (1) an initial sketch of a product is
(2) transformed into "a well understood design" that is (3) converted into a "3D computer aided
design program" that is (4) used to produce "production drawings" that (5) are provided to a
manufacturer that produces an actual model of the new product.  (Dec. 18, 2018 Tr. (Dkt. No.
159) at 87-88)

Lutz further testified that NCR "designed every component that [it] needed to go into that kiosk that was critical," such that "no further design work [was] needed" on the Version 1 kiosk. Lutz conceded, however, that NCR "left a very large number of items that were not defined as critical" to KT, giving KT "latitude to build [the Version 1 kiosk] in any form [KT] wanted to . . . as long as all the important components that [the two companies had] talked about [functioned]." In other words, NCR "left it up to KT to figure out how to build the unit to hold it together." (Dec. 18, 2018 Tr. (Dkt. No. 159) at 92, 95, 97-98)

Larsen, by contrast, testified that NCR's design team in Dundee shared only "some mockup renderings . . . a pdf or a PowerPoint presentation" with KT. Larsen described the NCR materials as "some kind of concept, [an] idea . . . [that] lack[s] the intelligence or the blueprint" to create a final product. (Dec. 20, 2018 Tr. (Dkt. No. 163) at 190)

By early August 2013, KT had provided NCR with initial production drawings for the Version 1 kiosk. NCR reviewed KT's production drawings before they were sent to the manufacturer "to make sure that . . . [there was] good fidelity between the production drawings and the industrial design" that NCR had provided to KT. (Jan. 3, 2019 Tr. (Dkt. No. 169) at 38) In an August 8, 2013 PowerPoint presentation, NCR gave KT "very specific feedback on the proposed production drawings from KT to match the needed NCR industrial design," including the dimensions and alignment of numerous components of the Version 1 kiosk. (See id. at 40-42; DX S)

Based on the recommendation of a business colleague, Larsen selected Karrie, a Chinese company, to do the metal manufacturing work required for the Version 1 kiosks. (Dec. 20, 2018 Tr. (Dkt. No. 163) at 195, 197) KT delivered the Version 1 kiosks to NCR and Tesco

7

in September 2013 (PX 80 at 36-37), and KT's Version 1 kiosk was "well received." (Dec. 21, 2018 Tr. (Dkt. No. 165) at 20)

## B. The Version 1 Kiosk Non-Disclosure Agreement

In August 2013, NCR requested that KT share its 3D CAD production drawings for the Version 1 kiosk with NCR. (Dec. 20, 2018 Tr. (Dkt. No. 163) at 192-94, 197) Larsen testified that, in the kiosk industry, "you don't give out your drawings. . . . If you take the drawings, the CAD drawings, and you give it to your customer, in theory then the customer can take [the drawings] and get [a particular kiosk project] done anywhere else they want." (Id. at 193-94) Larsen told Lutz that while KT "do[es]n't normally do that," he was "open to the suggestion," provided that the parties "sign a nondisclosure agreement." (Id. at 197)

Lutz responded by suggesting that Larsen prepare an NDA. In an August 22, 2013 email, after fielding "detailed questions [he'd] never been asked before," Lutz suggested that KT and NCR execute one of NCR's standard NDAs, which the parties could modify if specific concerns arose, and sent Larsen a copy of NCR's standard NDA. (PX 2) In an email later that day, Larsen stated that his

> . . . request was to have a confidentiality agreement which would cover the exact terms of
>
> 1. NCR agreeing not to use the mechanical and 3D drawings shared by KT for purpose of production elsewhere of the Tesco Mini Checkout Terminals.
>
> 2. NCR agreeing not to use the mechanical and 3D drawings for purpose of price negotiations on future orders, by that I mean by sharing them with outside parties to get alternative price quotes.
>
> Would that be something we can agree on . . . [?]

(Id.)

At trial, Larsen explained that he made these requests because he "didn't want [KT's mechanical and 3D drawings] to be used against [KT]," and that he communicated these

8

sentiments to Lutz "in several phone calls" after he sent this e-mail. (Dec. 20, 2018 Tr. (Dkt. No. 163) at 200) Lutz concedes that it is a "reasonable inference" from Larsen's email that KT believed that it would be producing its own mechanical and 3D drawings for the Version 1 kiosk. (Dec. 18, 2018 Tr. (Dkt. No. 159) at 106)

In a September 9, 2019 email, Larsen told Lutz that KT Group "made some changes to [NCR's standard] NDA," and asked if NCR would agree to the changes. (PX 6) In an email later that day, Larsen asked Lutz to confirm that NCR would agree to the conditions Larsen had proposed for sharing KT's "mechanical and 3D drawings." (PX 4; see also PX 2) In a September 10, 2019 email, Lutz stated that his "legal guy [was] looking at this." (PX 6) Larsen responded that he "hoped to have [the NDA] signed before [NCR's] offices close today . . . . I don't believe we have indicated anything else but what [Lutz] and [Larsen had] discussed with reference to the KT ownership of CAD and 3D drawing files etc." (Id.)

KT and NCR ultimately reached agreement on an NDA for the Version 1 kiosk project (the "Version 1 Kiosk NDA"). Lutz signed the Version 1 Kiosk NDA on behalf of NCR on September 11, 2013, and Larsen signed on KT's behalf a week later. (PX 16 at 2)

The Version 1 Kiosk NDA – which has an effective date of June 1, 2013 (id. at 1) – provides that

> [f]or a period of three years from the date of disclosure . . . and notwithstanding the termination of this Agreement, Recipient will: (a) not use Discloser's Confidential Information other than for the Authorized Purpose; (b) promptly notify Discloser upon discovery of any unauthorized use or disclosure of the Confidential Information; (c) exercise the same degree of care in protecting Discloser's Confidential Information as it uses to protect its own Confidential Information of a similar nature, but in no event less than reasonable care; and (d) not disclose Confidential Information to any third party, except to its Affiliates and subcontractors who (i) have a legitimate "need to know" to accomplish the Authorized Purpose, and (ii) are obligated to protect the Confidential Information
> . . . .

9

(Id. ¶ 3)

The Version 1 Kiosk NDA further provides that "Confidential Information . . .

disclosed under this Agreement remains Discloser's property. Other than a limited right as

necessary to carry out the Authorized Purpose, Discloser does not grant a license or convey any

rights under any patent, copyright, trade secret, trademark, or any other intellectual property

right." (Id. ¶ 6) "Subject to its compliance with this Agreement, either party may independently

develop or improve any product, service, or technology." (Id. ¶ 5)

The Version 1 Kiosk NDA defines "Confidential Information" as

information first disclosed by Discloser to Recipient between the Effective Date
and six months thereafter which is reasonably related to the Tesco London Kiosk
Project[,] for which a limited amount of hardware will be supplied by KT . . . ,
including material which is copyrighted to KT in specified production and
mechanical drawings, for the purpose of evaluating whether NCR will purchase
further hardware for use at various stores in the United Kingdom (the "Authorized
Purpose") and which is: (a) clearly designated, labelled, or marked as
confidential or its equivalent at the time of disclosure; or (b) of a nature such that
the Recipient knows or should know it to be confidential. . . .

(Id. ¶ 1)

The Version 1 Kiosk NDA states that it "is the entire understanding between the

parties, and supersedes all prior or contemporaneous oral or written agreements concerning its

subject matter." The agreement further provides that "[i]t may be modified only in a writing that

has been signed by both parties. Any agreement to expand Recipient's right to possess or use

Confidential Information must be acknowledged by Discloser in writing." (Id. ¶ 11) Finally, the

parties agreed that "a breach of this Agreement may give rise to irreparable injury that may not

be adequately compensated for by damages." (Id. ¶ 8)

Although the Version 1 Kiosk NDA refers to a disclosing party's "property," Lutz

testified that he did not "see anything in [the agreement] talking about the ownership of

10

material." According to Lutz, the Version 1 Kiosk NDA "has nothing to do with ownership," and instead addresses only the handling of the parties' confidential information. (Dec. 18, 2018 Tr. (Dkt. No. 159) at 128-30)

## C. NCR's Standard Purchase Order's Terms and Conditions

Lutz testified that the ownership of confidential information KT shared with NCR is governed by the terms and conditions of NCR purchase orders. At the end of August 2013, NCR began generating purchase orders for services KT rendered in connection with the Version 1 Kiosk project. KT Group, in turn, would submit corresponding invoices. (Dec. 18, 2018 Tr. (Dkt. No. 159) at 130-31; Dec. 21, 2018 Tr. (Dkt. No. 165) at 78-79; GX 80 at 36-37)

NCR delivers its purchase orders to vendors via e-mail notification from NCR's Enterprise Resource Planning ("ERP") system. (Dec. 18, 2018 Tr. (Dkt. No. 159) at 141) Typically, the bottom of the e-mail notification states: "To review country specific Terms and Conditions for NCR Purchase Orders Click Here." The phrase "Click Here" is hyperlinked to the relevant NCR terms and conditions. (See, e.g., PX 69)

Larsen testified that he received NCR purchase orders containing such hyperlinks, but that he did not click on them. According to Larsen, his "mail provider doesn't allow [him] to click on links that come from sources that [he] do[es]n't know" (Dec. 21, 2018 Tr. (Dkt. No. 165) at 80), and NCR never provided him with a hard copy of the NCR purchase order's terms and conditions: "[n]obody ever mentioned . . . anything about them." (Id. at 81) Larsen further testified that he was not interested in the information available through the hyperlink: "If there were something that [NCR] wanted to address, they would address it to [him] in person." Larsen maintained that he "wasn't informed that there were terms and conditions to [NCR's purchase] orders and [that he] do[es]n't click links in e-mails just as a policy." (Id. at 81-82)

11

NCR's standard purchase orders contain, inter alia, the following Terms and

Conditions:

> 8. CONFIDENTIALITY . . . Supplier shall not disclose to NCR any information
> that it deems to be confidential, and it is understood that no information that is
> received by NCR, including without limitation manuals, drawing and documents,
> will be deemed confidential. . . .

> 9. RIGHTS IN DEVELOPMENT. . . . Supplier shall disclose and assign on
> demand, and it does hereby assign to NCR, any and all inventions, improvements,
> or developments . . . which it may make or assist in making in the course of such
> development. Supplier assigns, and agrees hereafter, to assign to NCR all patents,
> copyrights, and applications for patents or copyrights, in connection with any
> such invention, improvement, or development, and to do all acts and execute all
> instruments which NCR may request. Supplier shall cause every appropriate
> person employed by or associated with it to enter into an agreement under which
> such person shall disclose and assign to Supplier or NCR all inventions and
> execute all papers and do all acts deemed necessary by Supplier or NCR relative
> to assignment of intellectual property, including but not limited to copyright and
> patents. In addition, all information, ideas, results, trademarks/names and data
> developed by Supplier as a result of developmental work contemplated by this
> section shall be transmitted by Supplier only to NCR and shall become the
> exclusive property of NCR. . . .

(PX 80 at 34)

Lutz testified that, "under these standard purchase terms and agreements, it is

NCR's policy that when we pay a supplier for a product that includes any development services,

that the work product of th[ose] development services is NCR's property. (Dec. 19, 2018 Tr.

(Dkt. No. 161) at 26) According to Lutz, pursuant to these terms and conditions, "anything that

KT designed . . . came over to [NCR] by virtue of operation of law." (Id. at 31) NCR never

expressly informed Larsen or anyone else at KT of this policy, however. (Id. at 26, 109)

## D. KT's Concern that NCR Would Not Choose
## KT as a Large Scale Supplier of Kiosks

Larsen testified that, "start[ing] . . . in 2013" and continuing throughout KT's

relationship with NCR, he "had discussions with [Lutz] about producing more units" of the

12

Version 2 kiosks for Tesco. "[B]ased on a[n] . . . email . . . from Mr. Lutz, [Larsen] understood that [KT] would be producing at least [2,000] to 3,000 units [for NCR]." (Dec. 21, 2018 Tr. (Dkt. No. 165) at 71) Larsen testified that Lutz "insinuated that he would be making productions of 1,850 units for Tesco initially. And I said to him, [w]e've been looking to do at least [2,000] to 3,000 units, and I said that to him verbally on a phone call. . . . I don't remember [his] exact words [in response], but the gist of the conversation or the reply I got [was that] he said he couldn't promise anything but he would see what he could do." (Id. at 71-72)

Larsen's concerns about whether NCR would use KT as a large-scale supplier of kiosks came to a head in October and November 2013. On October 29, 2013, Larsen e-mailed Lutz about "payment terms . . . for future orders." (PX 22 at 3) Lutz responded that he would "bring in some people . . . to work out the details on normal payment terms and the business arrangement if we decide to move forward with KT on this project." (Id. at 2)

Larsen replied:

Could I be frank and ask you for a direct reply when you write "if we decide to move forward with KT on this project[.]"

Is there some reason why NCR or you wouldn't move ahead, and if so what would that be?

I was on the understanding you had intentions to do so, and we committed [a lot] of resources to this so I would hope that we presented ourselves as a serious company to NCR and that we have delivered the product to you on time and that it was accepted by your client.

(Id. at 1)

Lutz answered:

One reason would be if we can't agree on payment terms. The other would be understanding how you would procure the NCR equipment that goes inside of the kiosk. Those are my two main topics of conversation that I want to have face-to-face with you in November along with the design feedback that we've received from the trial and showing it to other customers.

(Id.)

13

Lutz elaborated on these concerns at trial. As to payment terms, because KT was "a small company not having capitalization," Larsen "would need very quick payment of invoices" – but "NCR's standard policy is extended payment terms with our suppliers." (Dec. 19, 2018 Tr. (Dkt. No. 161) at 167) As to the second concern, "in Version 1 [Larsen] produced the entire kiosk, but that involved [NCR] actually buying a lot of . . . NCR[-]designated equipment, shipping it to KT and then KT assembl[ing] it. That would be problematic for long-term production because [NCR's] production chain has the capitalization to procure [its] own equipment." (Id. at 167-68) A third concern – not set forth in PX 22 – was that KT "wouldn't be able to meet [NCR's] cost objectives given that . . . [the] company didn't actually produce or assemble the kiosk," but instead employed a third-party manufacturer. "NCR would typically go . . . directly to a production facility that has that capability and not have a middleman. . . ." (Id. at 168) In sum, NCR saw KT as "a development service to create detailed production drawings" and as a partner with "rapid prototyping capabilities," but had reservations about KT's capacity "for volume production." (Id. at 165-66)

KT, NCR, and Tesco scheduled a meeting in London on November 18, 2013. In a November 4, 2013 email, Lutz explained to Larsen that the "[m]ain objective will be to discuss possible requirement changes for a next phase [of the kiosk project]. Would also like to have some business relationship discussions and challenges with you regarding KT as a long-term NCR supplier." (PX 24) At the London meeting, the parties "talked about the success [they] had with the Version 1 kiosk, the feedback from the store and Tesco, [their] plans to create a new Version 2 design with [Lutz's] NCR consumer experience design group, and [Lutz's] belief that KT could be a good partner for rapid prototyping again but that [Lutz] had serious reservations

14

that [KT Group] would be acceptable to NCR as a long-term volume supplier as [they] entered into standard production." (Dec. 19, 2018 Tr. (Dkt. No. 161) at 165-66)

Lutz testified that it was "clear in [his] conversation[s] with [Larsen] that [Larsen] want[ed] . . . to be a hardware supplier," rather than "just . . . a design house"; Larsen's "normal goal is to sell and deliver . . . actual kiosks." This is something "which NCR does very well already," however. (Id. at 170-71) In Lutz's view, "the objective of using KT was their ability to provide the development services to create the production drawings and have an available rapid prototyping capability with their own partners." (Id. at 171)

**E.    The Version 2 Kiosk, the Preparation of the Industrial Design and Production Drawings, and Internal Discussions at NCR Concerning KT's Role in this Project**

Despite its concerns about whether NCR would select KT as a large-scale supplier of kiosks, KT proceeded to work with NCR on rapid prototyping a Version 2 kiosk, which incorporated the "feedback" NCR and KT had received concerning the Tesco pilot project involving the Version 1 kiosk. (See Dec. 19, 2018 Tr. (Dkt. No. 161) at 58-59 ("[V]ersion [1] was the quick project we did for Tesco to go into three stores. . . . Version [2] was the result of learnings from that initial three-store pilot."))

Lutz testified that KT's role with respect to the Version 2 kiosk project was the same as with the Version 1 kiosk project: NRC "provided some preliminary industrial design drawings to KT . . . from the consumer experience design group in Dundee," so that KT "could start to evaluate creating production design drawings" for the Version 2 kiosk. (Jan. 3, 2019 (Dkt. No. 169) at 47, 48) In contrast to the "very quick industrial design" NCR had provided to KT in connection with the Version 1 kiosk, however, NCR's preparation of the industrial design for the Version 2 kiosk "was nearly a three-month process," which Lutz testified was led "by

15

[his] industrial design designers . . . in the consumer experience design group from Dundee, Scotland." (Id. at 34, 37) As with the Version 1 kiosk, Lutz maintains that "[no] non[-]NCR personnel [were] involved" in the creation of the industrial design for the Version 2 kiosk. (Id. at 34) KT was asked to "create the detailed production drawings from the NCR [industrial] design that was created by the consumer experience group in Dundee and then source that through rapid prototyping," so that the model Version 2 kiosks would be available quickly for trial runs in stores. (Dec. 19, 2018 Tr. (Dkt. No. 161) at 170)

Later in his testimony, however, Lutz conceded that NCR was in communication with KT about the development of the industrial design, and that these discussions took place before NCR provided a final industrial design to KT. Contemporaneous documents support the view that NCR had substantive conversations with NCR as the industrial design for the Version 2 kiosk was being developed. For example, in DX R – a document composed "at the early stages of the Version 2 Kiosk Project" – NCR employee Charlie Rohan, who led the Dundee Consumer Experience Design Group, "provid[es] feedback on some initial questions that KT had after getting a very early either sketch or drawing of the Version 2 [k]iosk that [NCR] was starting to contemplate." (Jan. 3, 2019 Tr. (Dkt. No. 169) at 42; see also DX R) And DX V "is a response from KT after [NCR] had provided some preliminary industrial design drawings to KT . . . for the Version 2" kiosks; the document contains "markups that the KT team had done on that industrial design with either questions or comments regarding their understanding of the current state of the industrial design." (Id. at 47, 48) While Lutz testified that DX R contains "many . . . questions . . . about the defining of the industrial design to a level that w[ould] enable KT to create the production drawings," and that DX V "reflects a fairly limited understanding of the intent for the kiosk from the engineer at KT [who] was giving [NCR] the feedback" (id. at 46-47,

16

53), these exhibits support KT's assertion – discussed below – that KT "had many discussions with NCR [about the industrial design]."

At trial, KT's Technical Director Steev Jones described extensive interaction with NCR personnel concerning the industrial design. (Dec. 20, 2018 Tr. (Dkt. No. 163) at 5-8, 25-26) According to Jones, KT personnel had weekly telephone conference calls with NCR personnel about the industrial design, and communicated with KT's employees in China – who actually created the 3D CAD designs – daily. (Id. at 6) In contrast to Lutz, Jones testified that the design for the Version 2 kiosk was KT's design. (Dec. 20, 2018 (Dkt. No. 163) at 37-38) ("It was our design.") While Jones agreed that "NCR play[ed] a role in the conceptualization of the [V]ersion [2] kiosk," he explained that NCR's role was as KT's

client, our customer. They came to us and they said, we would like a kiosk and we want it to do this and be able to do that. We had many discussions with NCR as to what they were looking for. We forwarded ideas to NCR. NCR, in return, gave ideas to us to help make the project a reality.

(Id. at 100)

In connection with the Version 2 kiosk project, NCR personnel prepared a "concept phase review" PowerPoint presentation for a February 10, 2014 internal NCR meeting. (See Dec. 19, 2018 Tr. (Dkt. No. 161) at 56-57) The PowerPoint presentation – which was prepared either by Lutz or by someone on his team – "describes [NCR's] program for the actual introduction of the SelfServ 90 to [the] market,"[6] and contains a "kind of [V]ersion [1] versus [V]ersion [2]" comparison. (Id. at 56, 58-59; PX 28) The final page of the presentation is entitled "Questions, Approvals, Follow-ups." A bullet point under this heading reads: "query kt on cad ownership – NCR [o]wns design, KT owns the detailed design." (PX 28 at 13) When questioned at trial about the statement that "KT owns the detailed design," Lutz had no

---

[6] The Version 2 kiosk became known as the SelfServ 90. (Jan. 3, 2019 Tr. (Dkt. No. 169) at 35)

17

explanation, stating that it was "unclear to [him] after th[ese] many years" what that line means. (Dec. 19, 2018 Tr. (Dkt. No. 161) at 182)

At about the same time as the "concept phase review," an NCR employee requested that KT be permitted to serve as a supplier in an unrelated project. (See PX 26 at 19-20) The request set off a lengthy e-mail chain within NCR about how KT should be classified in NCR's internal accounting systems – whether as a vendor of services, a provider of "third party products," or something else.

In a February 12, 2014 email, NCR employee Dan Lawrie wrote that he had spoken with Lutz and other NCR managers "on this subject," and observed that "we are definitely interested in KT as a supplier, and we want to have further conversations about that. They can provide design and rapid prototyping capabilities for us, with the speed to market that we need . . . and we want to discuss future opportunities in which we would want to use them." (Id. at 5) In a February 17, 2014 email, Robert Gutridge, a Commodity Director at NCR, wrote that his "initial idea is to NOT use this supplier for mass production but to allow [KT to be used] for design . . . . We would own the design. . . . I see no reason to add another production supplier here. . . . Thus the supplier KT [G]roup would only be a R&D/Engineering supplier and would not be allowed to support mass production." (Id. at 3) That same day, Steve Hassenzahl – NCR's Director of Engineering – Retail Products – sent the following email to Dan Lawrie and Lutz:

Dan,

I think we probably need to talk just the three of us. I seem to recall in our last call that Dusty was saying KT does not want to just be a design house. Yet that is what Robert [Gutridge] is proposing.

IF KT agreed with this method, we would then need to have ownership for the designs so that we can send them to our own vendors and release [them] in our

18

system. To do that, we need to tell KT upfront we own the CAD. Either that or my team needs to be shadowing them. . . .

(Id. at 1)

Lutz testified that his understanding – at the time this e-mail was sent – was that NCR already owned KT's 3D CAD drawings, and that Hassenzahl was "confused." (Dec. 19, 2018 Tr. (Dkt. No. 161) at 173-74) Lutz conceded, however, that KT was never told that NCR believed that it owned KT's 3D CAD drawings. (Dec. 19, 2018 Tr. (Dkt. No. 161) at 109 (Lutz testifying that he "did not tell KT upfront that [NCR] own[ed] the CAD"); see also Dec. 21, 2018 Tr. (Dkt. No. 165) at 22)

## F.    The Version 2 Kiosk Non-Disclosure Agreement

On February 26, 2014, shortly after Hassenzahl's e-mail to Lawrie and Lutz, Larsen e-mailed Lutz, stating that KT would "like to renew [the] current NDA that [the parties] signed last year to encompass the current new work." Larsen asked whether the two companies could "re[-]sign a new NDA with the same preliminary parameters as before but extend it from [their] initial 6 months to now include 24 months," observing that KT "has . . . proven itself as a valuable team member to [Lutz's] team and company in regards to the overall project." (PX 30) On February 28, 2014, having received no response, Larsen again e-mailed Lutz, asking for "a go ahead on the NDA from you in principle," or for Lutz to "share . . . if [you] have any concerns what they are." Larsen noted that KT wanted "to . . . share the new CAD Tesco files with [NCR's Dundee Consumer Experience Design Group] next week Tuesday, and [would] like to have [NCR's] commitment to the signed NDA before at least electronically communicated." (Id.) At trial, Larsen testified that KT requested the Version 2 kiosk NDA "to ensure that before we sent out the next proprietary CAD drawings that we were working on [for the Version 2

19

kiosk] we would have an NDA that covers those drawings." (Dec. 21, 2018 Tr. (Dkt. No. 165) at 24-25)

In a March 3, 2014 email to Larsen, Lutz attached a new NDA (the "Version 2 Kiosk NDA"), which he had signed. Lutz explained that he had "kept the NDA term at 6 months since it is tied specifically to the London V2 project." (GX 31) The terms of the Version 2 Kiosk NDA are identical to those set forth in the Version 1 Kiosk NDA, except that (1) the effective date is March 1, 2014; and (2) "Confidential Information" is defined not as "information . . . which is reasonably related to the Tesco London Kiosk Project . . . ," but as "information . . . which is reasonably related to the London V2 Kiosk Project. . . ." (GX 32)

## G. KT's Preparation of 3D CAD Drawings for the Version 2 Kiosk, and NCR's Request for Quote

By March 4, 2014, KT had "provided initial CAD design drawings [for the Version 2 kiosk] for NCR review." (GX 34)[7]

Jones testified that the 3D CAD drawings for the Version 2 kiosk were created by a KT engineer in China, who sent them to Jones. Jones "would inspect the files, make sure . . . that if there were additions, adjustments, changes, . . . that they were done correctly[, a]nd . . . demonstrate these files to the client." NCR reviewed the 3D CAD drawings, provided feedback, and made specific requests for changes. Jones "acted as a go-between" for changes – mostly minor, like "mak[ing] [a] corner more rounded"– that NCR sought. (Dec. 20, 2018 Tr. (Dkt. No. 163) at 7-8) Jones obtained NCR's approval for each 3D CAD drawing. (See, e.g., PX 45)

---

[7] As discussed above, "a CAD file is a 3D drawing that . . . can be moved around so you can," for example, "view it from different angles [and] view the internal components." (Dec. 20, 2018 Tr. (Dkt. No. 163) at 7) Using a special computer program, Jones displayed the 3D CAD files at issue here during his testimony. (See, e.g., id. at 16-36; GX 96)

According to Jones, the 3D CAD files for the Version 2 kiosk were "100 percent designed and created by KT." (Dec. 20, 2018 Tr. (Dkt. No. 163) at 35) Jones testified that there was only one occasion in which NCR provided KT with 3D CAD drawings that NCR had created; these drawings were of the Version 2 kiosk's printer.[8] In contemporaneous email concerning the Version 2 kiosk project, NCR described the material it was providing to KT as "high level designs," which KT would, in turn, "integrate . . . . into [its] detailed design." (See PX 36 at 2-3) At trial, however, Lutz insisted that "[a]ll of the KT 3D CAD models were based on the NCR special design model created [by Lutz's] consumer experience group in Dundee." (Dec. 19, 2018 Tr. (Dkt. No. 161) at 177)

In August 2014, NCR emailed Larsen a Request for Quote ("RFQ") for the production of 300 Version 2 kiosks, along with 2D drawings of parts of the kiosk. (See PX 49; Dec. 19, 2018 Tr. (Dkt. No. 161) at 142) The 2D drawings were "renderings from a 3D CAD model." (Dec. 19, 2018 Tr. (Dkt. No. 161) at 142-43) Lutz testified that the 2D drawings could have been renderings of KT's 3D CAD drawings, but that he was not sure. (Id. at 142) Only KT was sent this RFQ. (Id. at 142-43)

---

[8] Jones explained that the Version 2 kiosk contains "a number of components that come from . . . suppliers," including NCR itself. Suppliers of kiosk components sent KT 3D CAD designs for those components, which KT then "insert[ed] into [KT's] full assembly" – that is, into KT's overall 3D CAD design. Jones testified that to the extent that NCR supplied components for the kiosk – such as the printer – NCR probably sent KT 3D CAD drawings for those components. (Dec. 20, 2018 Tr. (Dkt. No. 163) at 31, 34)

As to the printer component, Jones explained that his communications with NCR about this device were "more complex" than for other aspects of the Version 2 kiosk design, because the initial printer design had caused glass in part of the kiosk to crack. NCR sent Jones a small 3D CAD file containing NCR's "possible solution" for the problem. KT tested NCR's proposed solution; "although it was better than the original design, it still didn't quite solve the problem . . . [s]o [KT] amended the design . . . and came up with our own [design]." Jones showed the jury the printer design in Exhibit 96, and pointed out the change between the KT re-design and NCR's proposed fix. (Id. at 8-9, 29-30, 32-33)

21

Three months later, on October 1, 2014, NCR emailed Larsen another RFQ, in which NCR "invit[ed] quotations for . . . four [sheet metal] subassemblies" of the Version 2 kiosk. (PX 52) The email directs vendors to "follow the link" at the bottom of the email "to [view] CAD, PDF and procurement specs" for the subassemblies. (Id.) NCR invited KT and five other companies – including Karrie – to bid on the production of the sheet metal assemblies.[9] (DX Z; PX 53) All of the vendors received an email containing the same link to "CAD, PDF and procurement specs," and all vendors received detailed 2D production drawings for the sheet metal assemblies. (Id.; Jan. 3, 2019 Tr. (Dkt. No. 169) at 78)

KT submitted bids pursuant to the RFQ. KT's bids for all parts but one were higher than any other bidder.[10] (PX 53) For example, KT bid $500 for assembly of the Version 2 kiosk's head enclosure, while Karrie's bid was $200. (Id.) On October 21, 2014, NCR informed Larsen that KT's bid was unsuccessful. (DX BB) When Larsen asked Lutz which company had the winning bid, Lutz refused to tell him. (Dec. 21, 2018 Tr. (Dkt. No. 165) at 38; Jan. 3, 2019 Tr. (Dkt. No. 169) at 81) At trial, Lutz testified that "the main issue [with KT's bid] was the price . . . of the [sheet metal] enclosure that [KT had] quoted." (Jan. 3, 2019 Tr. (Dkt. No. 169) at 81)

Karrie had the winning bid. Karrie used the same production drawings distributed to vendors as part of the RFQ process to manufacture the kiosk enclosures. (Jan. 3, 2019 Tr. (Dkt. No. 169) at 83)

---

[9] Although Lutz testified that NCR obtained quotes from seven companies (Jan. 3, 2019 Tr. (Dkt. No. 169) at 76), a table summarizing the bids lists six companies. (PX 53) The discrepancy is the product of KT's bid being counted twice. (See DX Z)
[10] KT was the second-highest bidder for the remaining part. (PX 53)

## H. KT Discovers its 3D CAD Drawings at Karrie

In July 2015, Larsen received a telephone call from "Steven," KT's general manager in China. Steven was at Karrie's manufacturing plant, and had observed that Karrie was then manufacturing products for NCR. (Dec. 21, 2018 Tr. (Dkt. No. 165) at 39-40) On July 13, 2015, Steven reported that he had observed fifty pieces of an "NCR [b]ending head unit" in Karrie's facility. (PX 75) Steven later sent Larsen photographs of metal parts and 2D production drawings he had seen at Karrie's plant. (Dec. 21, 2018 Tr. (Dkt. No. 165) at 44-50; PX 87) These photographs depicted production drawings and components of the Version 2 kiosk's head unit and front chassis. (Dec. 21, 2018 Tr. (Dkt. No. 165) at 44-50) At Larsen's request, Jones prepared a document comparing the production drawings shown in Steven's photographs with corresponding portions of KT's 3D CAD drawings. (Id. at 51, GX 88) After this exercise, Larsen and Jones "were . . . nearly convinced" that the drawings were the same. (Dec. 21, 2018 Tr. (Dkt. No. 165) at 51) Jones also prepared a document comparing the part numbers listed on the production drawings and imprinted on the metal parts shown in Steven's photographs with the part numbers shown in KT's 3D CAD for the corresponding parts of the Version 2 kiosk. (PX 90)

At trial, Jones testified that the 2D production drawings Steven had photographed at Karrie were "designed by KT." (Dec. 20, 2018 Tr. (Dkt. No. 163) at 52) He also explained that the 2D production drawings Steven had observed were "created from the 3D model." (Id. at 82) Jones also showed the jury the 3D CAD counterparts of the 2D drawings Steven had observed at Karrie, including drawings of the hinge connecting portions of the kiosk's head unit; the printer sled; the head unit; the pedestal; the mount for the head unit; and the head unit cabinet. Jones also highlighted similarities between KT's 3D CAD drawings and the drawings

23

attached to NCR's RFQ, including nearly identical measurements for various parts. (Id. at 53-76; PX 100, 109, 115-17, 124) Jones testified that given the similarities between KT's 3D CAD drawings and the 2D drawings attached to the RFQ, "[t]he work represented in these [2D] drawings is 100 percent KT's work." (Dec. 20, 2018 Tr. (Dkt. No. 163) at 79)

At trial, KT also cited a March 3, 2015 internal NCR email concerning an "issue[]" with the gasket material on [a] white cabinet" that NCR had observed during a visit to Karrie's manufacturing facility. (PX 68 at 2) The email states: "The original KT design appears to have never really allowed space for that gasket in the design. . . . [T]he NCR copy of their design does not allow [a] gap for that gasket." (Id.) KT argued that this email confirms that NCR "copied" its designs.

By contrast, Lutz testified that NCR independently created the 2D production drawings, using 3D CAD files that NCR had created.[11] Lutz testified that although KT Group had "a set of production drawings for the rapid prototyping phase," NCR's engineering team in the Philippines had "creat[ed] new production drawings before issuing the RFQ," because KT's drawings "didn't have the level of detail that [NCR's] engineering standards called for." (Jan. 3, 2019 Tr. (Dkt. No. 169) at 61, 88-89) According to Lutz, KT's drawings were not sufficiently detailed to permit a manufacturer to know precisely how to fabricate the Version 2 kiosk's parts. (Id. at 61, 66-73, 88-89) In asserting that NCR's 2D production drawings "were not derived from" KT's 3D CAD files, Lutz testified that he "ha[d] looked at the KT 3D CAD files and . . . the NCR production drawings, and . . . clearly s[aw] major differences in those drawings. (Id. at 85-86)

---

[11] The parties stipulated at trial that "no 3D CAD computer files in a form similar to Plaintiff's Exhibit 96" – which contains the 3D CAD files KT created for the Version 2 kiosk – "were produced [by NCR] to KT in pretrial discovery." (Jan. 3, 2019 Tr. (Dkt. No. 169) at 9)

24

Lutz clarified, however, that he "wouldn't . . . go[] [so] far" as to say that KT's "3D CAD drawings were not relied on in any fashion for the preparation of" NCR's production drawings. (Id. at 99-100) Moreover, Lutz conceded that he does not know "the genesis of th[e] . . . detailed production drawings" contained in the link that NCR provided in the RFQ, and that he could not say "whether or not [NCR's engineers in the Philippines] used KT files in the creation of those files." (Dec. 19, 2018 Tr. (Dkt. No. 161) at 147, 190) Indeed, while Lutz testified that he "kn[e]w that at least some of the[] [production drawings included with the RFQs] had to be completely modeled from scratch," he could not say how many, and he agreed that "some of those [drawings attached to the RFQ] . . . may have been" derived from KT's drawings." (Id. at 192-93)

Although KT did not become a large-scale supplier of kiosks to NCR, NCR paid KT "[j]ust under half a million dollars" for its work on the Version 1 and Version 2 kiosks. (Jan. 3, 2019 Tr. (Dkt. No. 169) at 13-14; see also PX 80) Larsen testified that KT "got paid for the [kiosk] units that [it] produced for [NCR] and nothing else," and complained that the money KT received from NCR was not sufficient to cover KT's time, labor, or expenses in designing the 3D CAD drawings for the Version 2 kiosks. Larsen estimated that the cost of KT's time, labor and expenses amounted to $50,000. (Dec. 21, 2018 Tr. (Dkt. No. 165) at 72-73, 76-77)

By contrast, Lutz testified that NCR had paid an "inflated price" for the Version 1 kiosks, and that NCR had "bundle[d] the design services into the . . . purchase [price]" of those kiosks. (Jan. 3, 2019 Tr. (Dkt. No. 169) at 12-13) According to Lutz, certain of NCR's payments for the Version 2 kiosks specifically addressed KT's "design services." In this regard, Lutz cited a March 20, 2014 NCR purchase order issued to KT, which refers to "SelfServ 90 Detailed Design." (Jan. 3, 2019 Tr. (Dkt. No. 169) at 12-13; PX 80)

## II. JURY CHARGE, DELIBERATIONS, AND VERDICT

As to KT's breach of contract claim, the Court gave the following instruction:

In order to prove its breach of contract claim, KT must prove each of the following elements by a preponderance of the evidence:

First, that the nondisclosure agreements between KT and NCR were valid contracts;

Second, that KT performed its obligations under the nondisclosure agreements[;]

Third, that NCR breached its obligations under the nondisclosure agreements[;]

And fourth, that NCR's breach of its contractual obligations under the nondisclosure agreements directly and proximately caused damage to KT.

If you determine that NCR is liable for breaching the nondisclosure agreements, you must then decide the extent of the damages it owes KT.

(Jury Charge (Dkt. No. 169) at 206)

In its charge, the Court noted that "NCR denies KT's [breach of contract claim] for a number of reasons," including that "it independently created the drawings that it provided to Karrie," and that even if it had not, it disclosure of the drawings to Karrie "was permissible under the nondisclosure agreements because it falls within the 'authorized purpose' of the agreements." "NCR also argues that KT's disclosure of confidential information took place during a time period not covered by the nondisclosure agreements. And finally, NCR contends that it had no obligation to maintain the confidentiality of KT drawings."[12] (Id. at 208-09)

---

[12] NCR asked the Court to instruct the jury that, "to the extent [the jury] find[s] that any specific element of NCR's production drawings were copied from KT's production drawings, [the jury] must decide whether NCR owned those elements according to the [t]erms and [c]onditions [of NCR's purchase orders.]" (Def. Proposed Supp. Charge (Dkt. No. 139-1)) NCR submitted this language in response to the Court's direction to provide a proposed instruction and supporting law addressing the issue of contract modification, to the extent that NCR intended to argue that the NDAs were modified by NCR's purchase orders. (Order (Dkt. No. 137))

As to the fourth element of a breach of contract claim – damages – the Court gave

the following instruction:

> KT argues that it suffered damages as a result of NCR's alleged breach of the non-disclosure agreements. KT seeks lost profits for kiosks it would have produced if NCR had not breached the non-disclosure agreements.
>
> If you find that KT has proven by a preponderance of the evidence that NCR breached the nondisclosure agreements, you must then decide whether NCR's breach directly and proximately caused KT to suffer damages.
>
> Damages are proximately caused by the defendant's conduct where the evidence demonstrates that defendant's conduct played a substantial part in causing the damage, and that the damage was either a direct result or a reasonably probable consequence of that conduct. If you find that KT has proven by a preponderance of the evidence each element of a breach of contract claim, including that NCR's breach directly and proximately caused damage to KT, then you will find for KT on its breach of contract claim.

(Id. at 210)

As to the unfair competition claim, the Court charged that

KT must prove each of the following elements by a preponderance of the evidence:

First, that NCR misappropriated KT's 3D CAD drawings for its own commercial advantage; and

Second, that NCR did so in bad faith.

To establish the first element, KT must prove that NCR misappropriated the results of KT's expenditure of time, labor and talent without permission and in an attempt to profit from KT's work. To prove that NCR acted in bad faith, KT must prove that NCR acted out of dishonest purpose. This can be shown, for example, by evidence that NCR engaged in fraud or deception, or abused a confidential relationship.

(Id. at 211)

As to damages for breach of contract, the Court gave the following instruction:

_____

The Court ultimately did not charge the jury on contract modification, because it concluded that no reasonable jury could find that KT's response to the purchase orders worked a modification to the NDAs. (Charge Conference Tr. (Dkt. No. 167) at 20-21)

KT seeks to recover lost profits on its breach of contract claim. KT's lost profits claim is premised on the notion that, but for NCR's breach of the nondisclosure agreements, KT would have produced kiosks for NCR and earned a profit on each kiosk. You may award KT damages for lost profits only if you find that KT has, one, demonstrated with certainty that the damages KT seeks were caused by NCR's breach of the nondisclosure agreements [and] two, the extent of its loss has been proven with reasonable certainty; and three, the damages were fairly within the contemplation of the parties.

(Id. at 212)[13]

        As to damages for unfair competition, the Court instructed the jury as follows:

KT seeks to recover actual damages on its unfair competition claim. In the event that you determine that KT has proven its unfair competition claim but has not offered sufficient evidence that it suffered a specific amount of damages, you may award KT nominal damages.

I will now instruct you as to both actual and nominal damages. Actual damages consist of a plaintiff's direct economic losses and out-of-pocket expenses resulting from a defendant's unlawful conduct. In other words, actual damages means the amount of money that will reasonably and fairly compensate KT for NCR's misappropriation of KT's 3D CAD drawings.

Accordingly, if you find that NCR engaged in unfair competition, you must award KT the sum that you find by a preponderance of the evidence fairly and justly compensates KT for any damages that it has sustained, and is reasonably certain to sustain in the future, as a direct result or a reasonably foreseeable consequence of NCR's conduct. The damages cannot be remote, contingent, or speculative. On the other hand, you do not need to find the damages with mathematical certainty. As I have said, this standard is reasonable certainty.

KT argues that it is entitled to recover damages on its unfair competition claim for its time, labor, and expenses expended in the development of the 3D CAD drawings at issue. You have heard testimony that the cost of KT's time, labor, and expenses is $50,000. To award KT damages for its time, labor, and expenses, you must find that KT has established by a preponderance of the evidence the amount it is entitled to recover. You may not award KT damages for its time, labor, and expenses if you find that the amount KT alleges it expended is merely speculative or conjectural. In the event you determine that KT is entitled to damages for its time, labor, and expenses, you must consider whether NCR has made any payments already to KT for those costs. If NCR has made such

---

[13] In its Amended Proposed Requests to Charge, KT did not seek a charge on nominal damages in connection with its breach of contract claim (see Dkt. No. 134 at 12-13), and the Court did not instruct the jury on nominal damages with respect to KT's breach of contract claim.

payments, you must subtract that amount from the amount you award to KT for its time, labor, and expenses.

If you find that KT has proven by a preponderance of the evidence that NCR is liable for unfair competition but that KT has not sufficiently proven that it is entitled to actual damages, you may award KT nominal damages. Nominal damages may not be awarded for more than a token sum, for example, one dollar.

(Id. at 212-14)

The jury began its deliberations on January 3, 2019. On January 4, 2019, the jury sent out the following note: "We are seeking clarification on whether the law allows us to apply the plaintiff's request for 'actual damages' towards a claim for breach of contract damages." The Court responded that the answer to the jury's question is "no." The jury then resumed its deliberations. (Court Ex. 3; Jan. 4, 2019 Tr. (Dkt. No. 170) at 3, 6) Later that day, the jury returned a verdict finding that KT had proven its breach of contract and unfair competition claims against NCR. The jury awarded KT no damages on its breach of contract claim and $50,000 on its unfair competition claim. (Verdict (Dkt. No. 149))

## DISCUSSION

## I. LEGAL STANDARD

The standard for granting judgment as a matter of law under Rule 50 of the Federal Rules of Civil Procedure is "well established":

Judgment as a matter of law may not properly be granted under Rule 50 unless the evidence, viewed in the light most favorable to the opposing party, is insufficient to permit a reasonable juror to find in her favor. In deciding such a motion, the court must give deference to all credibility determinations and reasonable inferences of the jury, and it may not itself weigh the credibility of witnesses or consider the weight of the evidence. Thus, judgment as a matter of law should not be granted unless

(1) there is such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or

(2) there is such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded [persons] could not arrive at a verdict against [it].

29

Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp., 136 F.3d 276, 288 (2d Cir. 1998) (citations

omitted); see also Brady v. Wal-Mart Stores, Inc., 531 F.3d 127, 133-34 (2d Cir. 2008) (same).

The Second Circuit has noted that "[j]udgment as a matter of law on an issue as to

which the movant bears the burden of proof is 'rare.'" Broadnax v. City of New Haven, 415

F.3d 265, 270 (2d Cir. 2010) (quoting Granite Computer Leasing Corp. v. Travelers Indem. Co.,

894 F.2d 547, 551 (2d Cir. 1990)). "'A verdict should be directed in such instances only if the

evidence in favor of the movant is so overwhelming that the jury could rationally reach no other

result.'" Id. (quoting Granite Computer Leasing Corp., 894 F.2d at 551, and citing Fairbrother v.

Morrison, 412 F.3d 39, 53 (2d Cir. 2005); Yurman Design, Inc. v. PAJ, Inc., 262 F.3d 101, 109

(2d Cir. 2001).

## III.    ANALYSIS

### A.    The Jury's Decision Not to Award Damages to KT on
   its Breach of Contract Claim Does Not Entitle NCR
   to Judgment as a Matter of Law on that Claim

NCR contends that it is entitled to judgment as a matter of law on KT's breach of

contract claim because "the [j]ury found that KT had not been damaged as a result of any breach

of the NDAs, which is a required element for any breach of contract claim."[14]   (Def. Br. (Dkt.

No. 158) at 7)

---

[14]   In response to NCR's argument, KT cites cases holding that "'[t]he victim of a breach of
contract is always entitled to nominal damages if he proves a breach but no damages.'"   (See
Pltf. Opp. Br. (Dkt. No. 173) at 9 (quoting Maalouf v. Salomon Smith Barney, Inc., No. 02 CIV.
4770 (SAS), 2004 WL 2008848, at *5 n.63 (S.D.N.Y. Sept. 8, 2004), aff'd sub nom. Maalouf v.
Citigroup Glob. Markets, Inc., 156 F. App'x 367 (2d Cir. 2005))).   As discussed above, however,
in its Amended Proposed Requests to Charge (Dkt. No. 134 at 12-13), KT did not seek an
instruction on nominal damages with respect to its breach of contract claim, and the Court did
not instruct the jury on nominal damages in connection with that claim.

KT now asks this Court to "amend the judgment to include nominal damages."   (Pltf. Opp. Br.
(Dkt. No. 173) at 12)   That request is denied because (1) KT did not seek a nominal damages

"Under New York law, 'an action for breach of contract requires proof of (1) a contract; (2) performance of the contract by one party; (3) breach by the other party; and (4) damages.'" First Invs. Corp. v. Liberty Mut. Ins. Co., 152 F.3d 162, 168 (2d Cir. 1998) (citation omitted). "[T]he mere violation of a contractual provision, standing alone, does not constitute a 'breach' under New York law"; rather, "[a] [p]laintiff also must demonstrate that it suffered damages as a result of the violation." Zamora v. Morphix Co., Ltd., No. 15-CV-6532 (KBF), 2018 WL 1033228, at \*7 (S.D.N.Y. Feb. 21, 2018) (emphasis in original), aff'd, 764 F. App'x 96 (2d Cir. 2019).

New York law permits a plaintiff to demonstrate "damages" even in the absence of proof of actual loss, however. "[W]here actual damages have not been proven with the requisite certainty, and indeed even if the breach of contract caused no loss at all, nominal damages are available 'as a formal vindication of plaintiff's legal right to compensation.'" NAF Holdings, LLC v. Li & Fung (Trading) Ltd., No. 10 CIV. 5762 (PAE), 2016 WL 3098842, at \*17 (S.D.N.Y. June 1, 2016) (quoting Freund v. Washington Square Press, Inc., 34 N.Y.2d 379,

---

charge on its breach of contract claim and the jury did not award nominal damages on that claim; and (2) the request to amend the judgment is untimely.

As to the first point, KT has cited no law suggesting that this Court can amend a judgment to provide for a damage award that Plaintiff did not seek and that the jury did not award.

As to timeliness, Fed. R. Civ. P. 59(e) provides that "[a] motion to alter or amend a judgment must be filed no later than 28 days after entry of the judgment." Fed. R. Civ. P. 59(e). Here, judgment was entered on January 8, 2019, and an amended judgment was entered – at Plaintiff's request – on January 10, 2019. (Judgment (Dkt. No. 148); Am. Judgment (Dkt. No. 153)) Defendant's opposition brief was filed on February 8, 2019, more than 28 days after the initial judgment was entered. Although the brief was filed exactly 28 days after the amended judgment was entered, "[w]here both an original and an amended judgment exist, a party 'may not [base] its own untimely request for alteration of the . . . judgment on a wholly independent' ground from the one that gave rise to the amended judgment." Padilla v. Maersk Line, Ltd., No. 07 CIV. 3638 RMB THK, 2012 WL 4009555, at \*1 (S.D.N.Y. Sept. 12, 2012) (quoting McNabola v. Chicago Transit Auth., 10 F.3d 501, 520 (7th Cir. 1993)).

384 (1974), and citing T & N PLC v. Fred S. James & Co. of N.Y., Inc., 29 F.3d 57, 60 (2d Cir. 1994) ("[N]ominal damages are always available for breach of contract."); Kronos, Inc. v. AVX Corp., 81 N.Y.2d 90, 95 (1993) (same)).

In arguing that it is entitled to judgment as a matter of law on KT's breach of contract claim – because the jury awarded KT no damages on that claim – NCR confuses the damages element of a breach of contract claim with KT's obligation to prove its damages with reasonable certainty. Although NCR asserts that "the [j]ury found that KT had not been damaged as a result of any breach of the NDAs" (Def. Br. (Dkt. No. 158) at 7), the jury's verdict reflects no such result.

This Court instructed the jury that in order for KT to prove its breach of contract claim, KT had to demonstrate not only that NCR breached its contractual obligations under the NDAs, but also that "NCR's breach of its contractual obligations under the nondisclosure agreements directly and proximately caused damage to KT." (Jury Charge (Dkt. No. 169) at 206) Immediately after listing all four elements of a breach of contract claim – including the element "that NCR's breach of its contractual obligations under the nondisclosure agreements directly and proximately caused damage to KT" – the Court stated: "If you determine that NCR is liable for breaching the nondisclosure agreements, you must then decide the extent of the damages it owes KT." (Id.) Accordingly, the Court's instructions outlined a two-step process for the jury, in which it would first determine whether KT had satisfied the four elements for proving liability on a breach of contract claim and, if so, go on to consider "the extent of the damages [NCR] owes KT." (Id.)

The verdict sheet (Dkt. No. 149) mirrors the two-step process described in the jury instructions. The first question addresses liability, and asks whether "KT [has] proven, by a

32

preponderance of the evidence, that NCR breached one or more of the non-disclosure agreements entered into by KT and NCR?" (Id.) The jury answered that question "yes." The second question addresses damages, and asks whether "KT [has] proven, by a preponderance of the evidence, that it is entitled to damages for NCR's breach [of contract]?" The jury answered that question "no." (Id.)

The Court's instructions explicitly state that – in order to find that NCR committed breach of contract – the jury had to find that NCR "directly and proximately caused damage to KT" by breaching one or both of the NDAs. (Jury Charge (Dkt. No. 169) at 206) Because, "in all cases, juries are presumed to follow the court's instructions," CSX Transp., Inc. v. Hensley, 556 U.S. 838, 841 (2009), the jury in this case is presumed to have found – in finding in KT's favor as to liability – that NCR had "directly and proximately caused damage to KT" in breaching one or both of the NDAs.

Determining the appropriate amount of damages – if any – to award is, of course, a separate inquiry from determining whether a defendant caused damage to plaintiff at all. As to the appropriate amount of damages, the Court explained that KT "seeks to recover lost profits on its breach of contract claim," and that the jury could "award KT damages for lost profits only if [the jury] finds that KT has [1] demonstrated with certainty that the damages KT seeks were caused by NCR's breach of the nondisclosure agreements; [2] the extent of its loss has been proven with reasonable certainty; and [3] the damages were fairly within the contemplation of the parties." (Jury Charge (Dkt. No. 169) at 212) In the circumstances of this case, there is nothing inconsistent about the jury's finding, on the one hand, that NCR directly and proximately caused damage to KT by breaching the NDAs, and the jury's finding, on the other hand, that KT had not proven "the extent of its loss . . . with reasonable certainty." Such jury findings are not

33

uncommon. See, e.g., Int'l Cards Co. Ltd. v. Mastercard Int'l Inc, 741 F. App'x 41, 43 (2d Cir. 2018) ("The jury found for Mastercard with respect to its cross-claim for breach of contract but awarded no damages."); Fab-Tech, Inc. v. E.I. DuPont De Nemours & Co., 311 F. App'x 443, 445, 447 (2d Cir. 2009) (recounting that the jury "found DuPont liable for two counts of breach of contract" – breaches of a "1999 Agreement" and a "2000 Agreement" – but "awarded no damages on the [breach of the] 1999 Agreement").

The cases cited by NCR (Def. Br. (Dkt. No. 158) at 12-14, 16; June 28, 2019 Def. Supp. Ltr. (Dkt. No. 175)) are not to the contrary. These cases do not suggest that a jury's verdict finding a defendant liable for breach of contract should automatically be vacated where the jury does not award damages.

In Holland Loader Co., LLC v. FLSmidth A/S, 313 F. Supp. 3d 447, 483 (S.D.N.Y. 2018), aff'd, 769 F. App'x 40 (2d Cir. 2019), for example, the district court – after a bench trial – concluded that "[a]lthough Plaintiff was shafted by Defendant's breach of its duties under the IP Agreement, the Court is constrained to find in favor of Defendant because Plaintiff has failed to prove by a preponderance of the evidence that it suffered damages as a result of Defendant's breach." Holland Loader Co., 313 F. Supp. 3d at 480. In affirming the district court's ruling on appeal, the Second Circuit repeatedly emphasized the distinction between proving that a plaintiff suffered damage, and proving the amount of damages to be awarded. "The district court found that Holland failed to prove . . . the existence of damage caused by the breach. . . . The district court here . . . did not reach the question of the amount of damages. It found that Holland failed to prove by a preponderance of the evidence that it suffered damages as a result of [the] breach." Holland Loader Co. LLC v. FLSmidth A/S, 769 F. App'x 40, 42-43 (2d Cir. 2019) (internal quotation marks and citation omitted) (emphasis in original).

34

Here, based on the Court's instructions, in order to find liability the jury had to find that KT had demonstrated that it had suffered damage. The fact that KT could not demonstrate the amount of damages it suffered provides no basis for vacating the jury's verdict on the breach of contract claim.

Similarly, in Zamora v. Morphix Co., Ltd., No. 15-CV-6532 (KBF), 2018 WL 1033228, at \*7 (S.D.N.Y. Feb. 21, 2018), aff'd, 764 F. App'x 96 (2d Cir. 2019), the district court vacated a jury's verdict for defendant on a breach of contract counterclaim where the court found "insufficient evidence that Morphix suffered damage of any kind . . . , regardless of whether [Zamora's] conduct" – securing employment with another company – violated a consulting agreement she had signed with Morphix. Zamora, 2018 WL 1033228, at \*7. The Second Circuit affirmed, explaining that "Morphix is not entitled to recover damages unless it suffered as a result of Zamora's breach. . . . Any damage [to Morphix] was caused by Zamora's decision to leave . . . , but Zamora's departure was not a breach of the consulting agreement." Zamora v. Morphix Co., Ltd., 764 F. App'x 96, 98 (2d Cir. 2019).

Again, the difference between Zamora and the instant case is that – in order to find liability here – the jury had to find that KT had demonstrated that it had suffered damage. And KT presented at trial a plausible case that it had suffered damage: NCR had distributed to Karrie and at least four other competing vendors highly complex production drawings for a sophisticated self-checkout kiosk – drawings premised on 3D CAD drawings prepared by KT at an expense of at least $50,000 and protected by a non-disclosure agreement. The fact that KT could not prove the specific amount of damages it suffered as a result of NCR's breach of the

35

non-disclosure agreement does not permit this Court to vacate the jury's verdict finding that NCR breached the NDA.[15]

In sum, to the extent that NCR's motion for judgment as a matter of law on KT's breach of contract claim is premised on the argument that "the [j]ury found that KT had not been damaged," the motion will be denied.

## B.     NCR's Use of KT's Drawings Does Not Fall Within the Scope of the "Authorized Purpose" of the NDAs

NCR argues that its use of KT's drawings falls within the "authorized purpose" of

the NDAs, and therefore NCR did not breach the NDAs when it shared KT's drawings with

Karrie. (Def. Br. (Dkt. No. 158) at 27-28)

The definition of "Authorized Purpose" is set forth in the "Confidential

Information" section in each NDA. In the Version 1 Kiosk NDA, that paragraph reads as

follows:

> [I]nformation first disclosed by Discloser to Recipient between the Effective Date and six months thereafter which is reasonably related to the Tesco London Kiosk Project[,] for which a limited amount of hardware will be supplied by KT. . . , including material which is copyrighted to KT in specified production and mechanical drawings, for the purpose of evaluating whether NCR will purchase further hardware for use at various stores in the United Kingdom (the "Authorized Purpose") and which is: (a) clearly designated, labelled, or marked as confidential or its equivalent at the time of disclosure; or (b) of a nature such that the Recipient knows or should know it to be confidential. . . .

---

[15] Sea Tow Servs. Int'l, Inc. v. Pontin, 450 F. App'x 45 (2d Cir. 2011), also cited by NCR (Def. Br. (Dkt. No. 158) at 12) is not on point. In that case, the Second Circuit affirmed the district court's decision to vacate a breach of contract verdict in Pontin's favor where the jury wrote on the special verdict form that it was awarding Pontin damages in the form of "lawyers fee's [sic] associated with this case." The Second Circuit emphasized that "[t]he only evidence that Pontin incurred contract damages was his testimony that Sea Tow's breach of contract resulted in the loss of four towing opportunities, totaling $800." Sea Tow Servs. Int'l, Inc., 450 Fed. App'x. at 45. The jury had awarded Pontin no damages for this alleged loss, however, and the jury's decision to award Pontin attorneys' fees as damages suggested that the jury did not believe that Pontin had been "damaged," except for the costs he had incurred in litigating the case.

36

(PX 16, ¶1) The Version 2 Kiosk NDA contains the same language, except that it refers to the "London V2 Kiosk Project" rather than the "Tesco London Kiosk Project." (PX 32, ¶ 1)

NCR contends that the "Authorized Purpose" – to evaluate the purchase of hardware for use at various stores in the United Kingdom – is not "limit[ed] . . . to NCR's evaluation of purchasing 'further hardware' only from KT," but instead extends to "a wider selection of potential subcontractors, including Karrie." (Def. Br. (Dkt. No. 158) at 27-28) Given that the phrase "for the purpose of evaluating whether NCR will purchase further hardware" is contained within the same sentence that describes KT supplying "a limited amount of hardware for the . . . Kiosk Project," NCR's reading is not plausible. Moreover, NCR's reading is not consistent with Lutz's testimony at trial:

Q. . . . I want to ask you what your understanding is of the authorized purpose based on your view?

A. It is really to the rapid prototyping services that we were looking for KT to provide with regards to the London V2 Kiosk project.

Q. In terms of evaluating the purchase of hardware at various stores in the United Kingdom, can you point me to the provision that says that such an evaluation would be limited to purchasing the hardware for KT?

A. Well, in the third line it talks specifically about it is for a – for which a limited amount of hardware will be supplied by KT for this project.

(Jan. 3, 2019 Tr. (Dkt. No. 169) at 23-24)

NCR's reading is also entirely inconsistent with Larsen's expressed purpose in entering into the NDAs – to ensure that (1) "NCR agree[d] not to use the mechanical and 3D drawings shared by KT for the purpose of production elsewhere of the Tesco Mini Checkout Terminals"; and (2) "NCR agree[d] not to use the mechanical and 3D drawings for the purpose of price negotiations on future orders." (PX 2) In any event, the Court's charge directed the jury's attention to NCR's interpretation of this language, and apparently the jury rejected NCR's

37

implausible reading. NCR offers no basis for disturbing the jury's findings as to the scope of the NDAs' "Authorized Purpose" provision.

## C.     The Evidence Is Sufficient to Support the Jury's Verdict as to Breach of Contract

NCR argues that KT did not offer evidence sufficient to prove its breach of contract claim. (Def. Br. (Dkt. No. 158) at 9) According to NCR, it established at trial that "NCR's design concept and industrial design controlled the product drawings . . . and . . . NCR provided substantial input, guidance, and revisions to KT's . . . drawings." (Id.) NCR also argues that it "could not have breached the NDAs . . . because [it] created a new set of drawings for the final . . . kiosk design"; these drawings "were different from those used in the prototyping stage"; and these drawings "were made by NCR without any involvement or input from KT." (Id.) NCR's arguments are not persuasive, because KT offered contrary evidence that a reasonable jury could have found credible.

As to the contention that "NCR's design concept and industrial design controlled the product drawings," the jury easily could have concluded that KT's 3D CAD drawings differed in scope and kind from the "concept and industrial design[s]" that NCR provided. As an initial matter, although Lutz testified that NCR produced 3D CAD drawings, and provided them to KT (see Dec. 18, 2018 Tr. (Dkt. No. 159) at 91, 108), the parties stipulated that "no [such] 3D CAD computer files . . . were produced to KT in pretrial discovery." (Jan. 3, 2019 Tr. (Dkt. No. 169) at 9) The only other evidence that NCR provided 3D CAD drawings to KT is Jones' testimony that NCR provided such drawings for specific "third party components" of the kiosk, such as the Version 2 kiosk's printer. (Dec. 20, 2018 Tr. (Dkt. No. 163) at 31, 34)

There is no evidence that NCR produced and provided to KT 3D CAD drawings for the entire Version 1 or Version 2 kiosks. To the contrary, Larsen testified that NCR provided

38

"visual photos" and "mockups" that "lack[ed] the intelligence or the blueprint" from which a kiosk could be constructed. (Dec. 20, 2018 Tr. (Dkt. No. 163) at 190) Although NCR contends that Larsen's assertion is nothing more than "impermissible conclusory testimony" (Def. Br. (Dkt. No. 158) at 9), there was significant corroboration for his claim, including exhibits offered by NCR. For example, NCR introduced at trial a number of iterations of its industrial designs for the Version 1 and Version 2 kiosks. (See, e.g., DX J, DX K, DX L, DX M, DX P; Jan. 3, 2019 Tr. (Dkt. No. 169) at 53) None appear to provide a "blueprint" for the kiosks' manufacture. Indeed, DX M and DX P – which Lutz described as the "final" versions of the industrial designs for the Version 1 and Version 2 kiosks, respectively (Dec. 21, 2018 Tr. (Dkt. No. 165) at 166; Jan. 3, 2019 Tr. (Dkt. No. 169) at 53-54), are "visual . . . mockups" of the kiosks. And NCR's internal documents describe KT's work product as "detailed design[s]" distinct from NCR's "high-level designs." (PX 28, PX 36) While Lutz testified that NCR "designed every component" of the kiosks that was "critical" – such that "no further design work was needed" – a reasonable jury could have rejected that testimony as not credible.

As to the contention that "NCR provided substantial input, guidance, and revisions to KT's . . . drawings," the evidence demonstrated that NCR had significant involvement in the development of KT's work product. Indeed, Jones testified that NCR made a number of "design decisions" about various features of the Version 2 kiosk. (See Dec. 20, 2018 Tr. (Dkt. No. 163) at 137-58) The fact that NCR – as KT's customer – provided "input, guidance, and revisions" to KT's 3D CAD drawings does not demonstrate that these drawings are actually NCR's drawings, however.

As Jones explained,

NCR play[ed] a role in the conceptualization of the [V]ersion [2] kiosk. . . . The role was that NCR was our client, our customer. They came to us and they said,

we would like a kiosk and we want it to do this and be able to do that. We had many discussions with NCR as to what they were looking for. We forwarded ideas to NCR. NCR, in return, gave ideas to us to help make the project a reality.

(Dec. 20, 2018 Tr. (Dkt. No. 163) at 99-100)

Given that NCR was KT's customer, it is hardly surprising that NCR would have the final say on design issues. But given the evidence that KT's 3D CAD drawings could not have been developed solely from NCR's industrial designs, NCR's involvement in the design process does not demonstrate that KT's 3D CAD drawings are NCR's work product. In any event, given Jones' testimony that "[t]housands upon thousands" of "design decisions" went into the creation of the 3D CAD drawings (id. at 169), a reasonable jury could have concluded that the handful of decisions NCR highlighted at trial constitute an insignificant fraction of all of the decisions necessary to produce the 3D CAD drawings.

Finally, in contending that NCR created the production drawings attached to the RFQ (see Def. Br. (Dkt. No. 158) at 23), NCR simply ignores contrary evidence. NCR incorrectly asserts, for example, that "[t]he only evidence put forth by KT that NCR copied or used KT's production drawings is the conclusory testimony from Mr. Larsen and Mr. Jones." (Id. at 22) However, KT introduced an internal NCR email – reflecting communications between Lutz and other NCR employees – in which the fact that NCR copied KT's design is explicitly discussed. That email describes an "issue[] with the gasket material on [a] white cabinet" that NCR observed on a visit to Karrie's factory. (PX 68 at 2) The email states: "The original KT design appears to have never really allowed space for that gasket in their design. . . . [T]he NCR copy of their design does not allow [a] gap for that gasket." (Id.) In short, Larsen

40

and Jones' testimony that NCR had copied KT's 3D CAD drawings was corroborated by NCR's internal email traffic.[16]

And NCR's argument that Larsen and Jones offered "improper, conclusory and non-specific testimony" (Def. Br. (Dkt. No. 158) at 23) is likewise not persuasive. These witnesses' allegations of copying were supported by documentary evidence, including comparisons of KT's 3D CAD drawings with photographs of drawings and parts observed by KT's general manager at Karrie's factory in China. KT also introduced summaries demonstrating similarities between the drawings and parts "Steven" had observed in Karrie's

---

[16] Lutz's testimony concerning this email was not credible, as the following exchange demonstrates:

Q: Does it say anywhere [in DX 68] that NCR copied KT's design?

A: No. It is just referring there is an NCR version and there is a KT version.

THE COURT: Sorry. It says ["]the NCR copy of their design.["] Those words are there[,] right?

A: Yes. But it doesn't say where . . . it was copied from. Because if the form, fit and function is the same, an engineer would say they are copied one another because they both faithfully represent the design intent from the NCR industrial design version that is the master. The design of the Self-Serve 90 London kiosk was created from scratch by my industrial engineers in Dundee, Scotland.

THE COURT: When it says ["]the NCR copy of their design,["] what you are saying [is] that [it] doesn't actually mean a copy?

A: It doesn't mean copy, paste necessarily. It means that we created a set of production drawings that faithfully replicate the design that NCR intends.

THE COURT: But it says ["]copy of their design["]. . . . It doesn't say a copy of NCR's design. It says in effect a copy of KT's design. Isn't that what you understand ["]their["] to mean, ["]their["] is KT?

A. If I may try a different approach. . . .

(Dec. 19, 2018 Tr. (Dkt. No. 161) at 186-87)

factory and KT's 3D CAD drawings. (See Dec. 21, 2018 Tr. (Dkt. No. 165) at 45-51; PX 87, PX 88, PX 90) Indeed, at trial, Jones used KT's 3D CAD drawings and the production drawings NCR claimed it had produced to show the features that appeared identical, and the similarities in the measurements of various parts. (Dec. 20, 2018 Tr. (Dkt. No. 163) at 52-64; PX 96) In short, the proof of copying was not conclusory testimony, but was instead detailed testimony corroborated and supported by documentary exhibits explained by witnesses. While Lutz testified about alleged dissimilarities between NCR's production drawings and KT's 3D CAD drawings, the jury was free to find KT's witnesses more credible.

Accordingly, the evidence is sufficient to support the jury's verdict in favor of KT on its breach of contract claim.

## D. KT's Unfair Competition Claim Is Not Duplicative of its Breach of Contract Claim

NCR argues that it is entitled to judgment as a matter of law on KT's unfair competition claim because that claim "is duplicative of KT Group's claim for breach of contract .... Outside of the [breach of] the NDAs, KT has not pled any facts or offered any evidence that provides KT a basis to maintain its theory of unfair competition."[17] (Def. Br. (Dkt. No. 158) at 8) KT argues, however, that its "unfair competition claim, as argued before the jury, was largely predicated upon the fraudulent and bad faith conduct of Defendant and its agents in connection with Defendant's dealings with KT." (Pltf. Opp. Br. (Dkt. No. 173) at 13)

"'It is well-settled . . . that no claim [for unfair competition] lies where its underlying allegations are merely a restatement, albeit in slightly different language, of the 'implied' contractual obligations asserted in the cause of action for breach of contract.'" RCA

---

[17] NCR made no such argument at summary judgment.

42

Trademark Mgmt. S.A.S. v. VOXX Int'l Corp., No. 14 Civ. 6294 (LTS) (HBP), 2015 WL 5008762, at \*5 (S.D.N.Y. Aug. 24, 2015) (quoting Orange County Choppers, Inc. v. Olaes Enterprises, Inc., 497 F. Supp. 2d 541, 558 (S.D.N.Y. 2007)) (brackets in RCA Trademark Mgmt. S.A.S.). "Where a plaintiff's unfair competition claim is based entirely on the same alleged conduct proscribed by contract, and plaintiff has pled a breach of contract claim, the unfair competition claim is dismissed as duplicative of the breach of contract claim." Bytemark, Inc. v. Xerox Corp., 342 F. Supp. 3d 496, 508 (S.D.N.Y. 2018) (citing ScentSational Techs., LLC v. PepsiCo, Inc., No. 13 Civ. 8645 (KMK), 2017 WL 4403308, at \*18 (S.D.N.Y. Oct. 2, 2017); Bancorp Servs., LLC v. Am. Gen. Life Ins. Co., No. 14 Civ. 9687 (VEC), 2016 WL 4916969, at \*9 (S.D.N.Y. Feb. 11, 2016) (dismissing plaintiffs' unfair competition claim where it was "entirely based on alleged conduct that is proscribed by the 2010 NDA," and plaintiffs had not alleged that defendant "had any duty to them independent of the 2010 NDA, nor . . . alleged circumstances extraneous to that contract in support of their non-contract claims"); RCA Trademark Mgmt. S.A.S., 2015 WL 5008762, at \*5-6)

Where, however, "a defendant breaches its contract with a plaintiff, that defendant may also breach an independent duty in tort if the defendant goes beyond mere breach of contract and acts in such a way that a trier of fact could infer that it willfully intended to harm the plaintiff." Carvel Corp. v. Noonan, 350 F.3d 6, 16 (2d Cir. 2003); see also id. at 16 ("Where the plaintiff and defendant are parties to a contract, and the plaintiff seeks to hold the defendant liable in tort, the plaintiff must prove that the defendant breached a duty 'independent' of its duties under the contract; otherwise plaintiff is limited to an action in contract."); ScentSational Techs., 2017 WL 4403308, at \*18 (same) (internal quotation marks and citation omitted).

As this Court stated at the charge conference (Charge Conf. Tr. (Dkt. No. 167) at 29-30), KT's unfair competition claim clearly has its genesis in NCR's alleged breach of the NDAs. Stated another way, there would likely have been no lawsuit here absent the NDAs. The fact that KT's unfair competition claim has its genesis in NCR's breach of the NDAs is not dispositive on the question of whether KT's unfair competition claim is duplicative of its breach of contract claim, however, because "a defendant [that] breaches its contract with a plaintiff . . . may also breach an independent duty in tort if the defendant goes beyond mere breach of contract and acts in such a way that a trier of fact could infer that it willfully intended to harm the plaintiff." Carvel Corp., 350 F.3d at 16. Here, from the outset of this case, it has been clear that KT intended to argue that NCR did not merely breach the NDAs, but that it did so in bad faith, and had obtained access to KT's 3D CAD drawings based on fraudulent misrepresentations.

The Complaint alleges, for example, that NCR had "obtain[ed] unauthorized access to KT's confidential trade secrets," and had obtained KT's confidential information based on "fraudulent misrepresentations." (Cmplt. (Dkt. No. 1) ¶¶ 49, 57) Similarly, in its pretrial filings, KT claimed that NCR had wrongfully "obtained KT's technical kiosk drawings under the guise of a collaborative project it proposed to KT," and then "made unauthorized use of KT's technical kiosk drawings. . . for its own benefit; namely for the design and production of the award-winning SS90 kiosk." (Dkt. No. 99 at 5)

KT expanded on these themes at trial, and did so without objection from NCR. In his opening and throughout the trial, KT's counsel accused Lutz and NCR of acting in bad faith, and of securing disclosure of KT's 3D CAD drawings with no intention of abiding by the restrictions set forth in the NDAs. (See, e.g., Dec. 18, 2018 Tr. (Dkt. No. 159) at 50 (Plaintiff's assertion in opening that NCR had entered into non-disclosure agreements with KT concerning

44

KT's drawings, but never told KT that NCR believed that it owned KT's drawings); Dec. 19, 2018 Tr. (Dkt. No. 161) at 109 (Lutz testifying on cross-examination that he "did not tell KT upfront that [NCR] own[ed] the [3D] CAD"); Dec. 21, 2018 Tr. (Dkt. No. 165) at 22 (Larsen testifying that KT "w[as] never told" that NCR was the owner of KT's 3D CAD drawings); Jan. 3, 2019 (Dkt. No. 169) at 191 (Plaintiff asserting in summation that NCR never told KT "upfront" that they owned the 3D CAD drawings, and that NCR "[went] and sign[ed] another NDA knowing full well they were going to have this stuff") The evidence offered at trial makes out a claim of fraudulent inducement.[18]

As an initial matter, Larsen testified that when Lutz requested that KT share its 3D CAD drawings with NCR, he was reluctant to do so, because, in his experience in the kiosk industry, "you don't give out your drawings . . . . If you take the drawings, the CAD drawings, and you give it to your customer, in theory then the customer can take [the drawings] and get [a particular kiosk project] done anywhere else they want." (Dec. 20, 2018 Tr. (Dkt. No. 163) at 192-94) Accordingly, Larsen told Lutz that KT "do[es]n't normally" share its drawings, and that would only do if the parties "sign a nondisclosure agreement." (Id. at 197) Larsen communicated to Lutz both in email and by telephone that the non-disclosure agreement would have to restrict NCR from (1) "us[ing] the mechanical and 3D drawings shared by KT for purpose of production elsewhere," and (2) "us[ing] the mechanical and 3D drawings for purpose

---

[18] To state a claim for fraudulent inducement under New York law, a plaintiff must allege "'(1) that the defendant made a representation, (2) as to a material fact, (3) which was false, (4) and known to be false by the defendant, (5) that the representation was made for the purpose of inducing the other party to rely upon it, (6) that the other party rightfully did so rely, (7) in ignorance of its falsity (8) to his injury.'" Duckett v. Williams, 86 F. Supp. 3d 268, 274 (S.D.N.Y. 2015) (quoting Computerized Radiological Servs. v. Syntex Corp., 786 F.2d 72, 76 (2d Cir. 1986)). "The false representation can be either a misrepresentation or the material omission of a fact." Robinson v. Deutsche Bank Tr. Co. Americas, 572 F. Supp. 2d 319, 322 (S.D.N.Y. 2008).

of price negotiations on future orders, by that I mean by sharing them with outside parties to get alternative price quotes." (PX 2; Dec. 20, 2018 Tr. (Dkt. No. 163) at 199-200) In a September 10, 2013 email to Lutz sent the day before NCR executed the Version 1 Kiosk NDA, Larsen stated his belief that the Version 1 Kiosk NDA reflected "what [he and Lutz] discussed with reference to the KT ownership of CAD and 3D drawing files etc." (PX 6)

Lutz testified, however, that he believed – at the time – that regardless of the NDAs NCR, and not KT, owned any drawings that KT shared with NCR. According to Lutz, KT's drawings became the property of NCR as a result of NCR's purchase orders, which contained terms and conditions providing that "all information, ideas, results, trademarks/names and data developed by Supplier as a result of developmental work . . . shall become the exclusive property of NCR." (PX 80 at 34) According to Lutz, "anything that KT designed . . . came over to [NCR] by virtue of operation of law." (Dec. 19, 2018 Tr. (Dkt. No. 161) at 31) Although Lutz understood that Larsen believed that KT's ownership interest in its drawings would be preserved by the NDAs, Lutz never told Larsen that NCR owned KT's drawings as a result of the terms and conditions in the NCR purchase orders. (Dec. 19, 2018 Tr. (Dkt. No. 161) at 109) Instead, he allowed Larsen to believe that NCR would abide by the Version 1 Kiosk NDA, and allow KT to preserve control over its drawings.

The circumstances are similar with respect to KT's sharing of its drawings for the Version 2 kiosk. In a February 26, 2014 email to Lutz, Larsen states that he "would like to renew [the] current NDA that [the parties] signed last year to encompass the current new work." (PX 30) In another email to Lutz two days later, Larsen repeated that KT wanted "to . . . share the new CAD Tesco files [with NCR] . . . next week Tuesday, and [would] like to have [NCR's] commitment to the signed NDA before [they were] electronically communicated." (Id.) Larsen

46

explained at trial that KT requested the Version 2 Kiosk NDA "to ensure that before we sent out the next proprietary CAD drawings that we were working on [for Version 2 of the Tesco Project] we would have an NDA that covers those drawings." (Dec. 21, 2018 Tr. (Dkt. No. 165) at 24-25)

At about this time, Steven Hassenzahl, NCR's Director of Engineering – Retail Products, sent an email to Lutz stating that NCR "need[ed] to tell KT upfront we own the CAD." (PX 26 at 1) Lutz did not, however, "tell KT upfront," nor did he ever communicate to anyone at KT that NCR owned whatever CAD drawings KT shared with NCR. (Dec. 21, 2018 Tr. (Dkt. No. 165) at 22; see also Dec. 19, 2018 Tr. (Dkt. No. 161) at 109) Instead, Lutz responded to Larsen's email by executing a new NDA and transmitting the executed NDA to Larsen. (PX 31, PX 32) In other words, Lutz allowed Larsen to believe that NCR would abide by the terms of the Version 2 Kiosk NDA, and permit KT to preserve control over its drawings.

In his summation, Plaintiff's counsel tied Lutz's interactions with Larsen concerning the NDAs to KT's claims of bad faith:

Now, this is where we get to the question of bad faith. We have to show bad faith in relation to not the breach of contract case but the unfair competition case. . . . You've got to ask yourself this question: Did NCR know what they were doing? . . . . Did they heed the warning of Steven Hassenzahl, who says you need to tell them upfront what you're doing? Did they then go and sign another NDA knowing full well they were going to have this stuff? . . . Say we, yes.

(Jan. 3, 2019 Tr. (Dkt. No. 169) at 191)

In sum, Plaintiff's theory of unfair competition at trial was founded on themes of bad faith and fraudulent inducement. KT's unfair competition claim was not based simply on NCR's distribution of KT's drawings to third parties. Instead, KT's unfair competition claim was premised on Lutz's approach to inducing KT to share its drawings with NCR: agreeing to enter into NDAs with KT that Lutz did not intend to abide by – because NCR owned whatever

47

drawings KT shared with NCR – and doing so despite understanding that Larsen believed that NCR would abide by the NDAs, and that the NDAs would allow KT to preserve control over its drawings. That conduct is not "the same alleged conduct proscribed by contract," see Bytemark, Inc., 342 F. Supp. 3d at 508; rather, Lutz's conduct constitutes "circumstances extraneous to th[e] [NDAs]." Bancorp Servs., LLC v. Am. Gen. Life Ins. Co., 2016 WL 4916969, at *9.

Accordingly, KT's unfair competition claim is not duplicative of its breach of contract claim, and to the extent that NCR's motion for judgment as a matter of law on KT's unfair competition claim is premised on this argument, the motion will be denied. See Amphenol Corp. v. Paul, No. 3:12CV543 (AVC), 2013 WL 12251356, at *7 (D. Conn. Mar. 28, 2013) (New York common law unfair competition claim not duplicative of breach of contract claim where "the complaint relies upon [the defendant's] fraudulent and deceptive misappropriation of [the plaintiff's] confidential information without centering on the contractual dispute between the parties"); TVT Records v. Island Def Jam Music Grp., 244 F. Supp. 2d 263, 276 (S.D.N.Y. 2003) (where defendants argued that fraud claim was duplicative of breach of contract claim, denying summary judgment because "a reasonable jury could conclude that the activities TVT attributes to IDJ are indicative foremost of fraud, in the course of which a putative contract was utilized").

## E.     The Evidence Is Sufficient to Support the Jury's Verdict on KT's Unfair Competition Claim

NCR argues that it is entitled to judgment as a matter of law on KT's unfair competition claim, because "there is insufficient evidence that NCR acted with bad faith," and because "[t]here is no evidence that NCR misappropriated the results of KT's expenditure of time, labor, and talent, without permission, and in an attempt to profit from KT's work." (Def.

Br. (Dkt. No. 158) at 9, 27 (internal quotation marks omitted)) NCR's arguments are not persuasive.

An unfair competition claim requires proof that the defendant acted in bad faith. See Telecom Int'l Am., Ltd. v. AT & T Corp., 280 F.3d 175, 197-98 (2d Cir. 2001); Medtech Prod. Inc. v. Ranir, LLC, 596 F. Supp. 2d 778, 816 (S.D.N.Y. 2008) ("In order to state a claim of unfair competition under New York law, a plaintiff must allege that the defendant 'misappropriated the plaintiff['s] labors, skills, expenditures, or good will and displayed some element of bad faith in doing so.'" (citation omitted)) As this Court instructed the jury, a defendant acts in "bad faith" for purposes of an unfair competition claim where the defendant "act[s] out of [a] dishonest purpose." Capital Records, LLC v. Vimeo, LLC, No. 09-CV-10101 (RA), 2018 WL 1634123, at *5 (S.D.N.Y. Mar. 31, 2018); Jury Charge (Dkt. No. 169) at 211)

In arguing that KT did not prove bad faith, NCR focuses exclusively on its selection of Karrie, rather than KT, as its vendor for large scale production of the Version 2 kiosk. (See Def. Br. (Dkt. No. 158) at 25-26) KT's unfair competition claim is not premised on that decision, however. As discussed above, KT's theory of unfair competition at trial was that Lutz had fraudulently induced KT to share its 3D CAD drawings with NCR by entering into NDAs with KT that Lutz intended not to abide by. Lutz believed that – pursuant to NCR's purchase orders – NCR owned any drawing that KT shared with NCR. Lutz nonetheless executed the NDAs, knowing that Larsen believed that NCR would abide by the NDAs, and that the NDAs would protect KT's ownership of and control over its 3D CAD drawings. A reasonable jury could find that NCR had acted "out of a dishonest purpose" in negotiating the NDAs and convincing Larsen to share the 3D CAD drawings with NCR pursuant to the NDAs.

49

A reasonable jury could have also found that NCR misappropriated the results of KT's time, labor, and talent for its own profit and without KT's permission. The evidence at trial demonstrated that it was not "feasible" for NCR to satisfy Tesco's request that NCR "go from a design concept in July to a store installation . . . in September" by using only NCR's resources. (Dec. 18, 2018 Tr. (Dkt. No. 159) at 87) Accordingly, NCR turned to KT, "underst[anding] [that] KT was a well[-]respected . . . kiosk manufacturer and had capabilities for doing rapid prototyping." (Dec. 21, 2018 Tr. (Dkt. No. 165) at 178)

Lutz testified that it was necessary that NCR own the drawings KT created for the Version 2 kiosks, "because [NCR] need[ed] to be able to go out to quote to [its] vendor population, [its] suppliers and see who [NCR] want[ed] to award the long-term business to." (Dec. 19, 2018 Tr. (Dkt. No. 161) at 173) NCR did not tell KT that it intended to share KT's drawings with other vendors and suppliers, however. To the contrary, after KT made clear that it would only share its drawings with NCR if KT's ownership of and control over its drawings were protected, and only after NCR had provided assurances that KT's drawings would not be "shar[ed] with outside parties to get alternative price quotes" (PX 2), NCR entered into the NDAs. KT offered evidence, however, that it was always Lutz's intent to share KT's drawings with other vendors and suppliers, despite the NDAs. From this evidence, a reasonable jury could have concluded that NCR misappropriated the results of KT's time, labor, and talent.

NCR's motion for judgment as a matter of law on KT's unfair competition claim will be denied.

## F. The Damage Award on KT's Unfair Competition Claim Will Not Be Reduced

NCR argues that KT is not entitled to any damages on its unfair competition claim, "because the undisputed evidence clearly shows that NCR is entitled to an offset in the

50

amount NCR already paid to KT for its design work for the rapid prototyping stages," and because the jury's award "is based on impermissibly speculative testimony." (Def. Br. (Dkt. No. 158) at 10) Neither argument is persuasive.

Lutz testified – and KT does not dispute – that NCR paid KT "[j]ust under half a million dollars" for its work on the Version 1 and Version 2 kiosks (Jan. 3, 2019 Tr. (Dkt. No. 169) at 13-14; see also PX 80) The parties offered conflicting evidence about what services NCR's payment covered, however.

According to Lutz, NCR paid an "inflated price" for the Version 1 kiosks, which "bundle[d] the design services into the . . . purchase [price]" for the Version 1 kiosks. (Jan. 3, 2019 Tr. (Dkt. No. 169) at 12-13) As for the Version 2 kiosks, Lutz cites a March 20, 2014 NCR purchase order – which contains the description "SelfServ 90 Detailed Design" – as proof that NCR's payment covered KT's design services. (Jan. 3, 2019 Tr. (Dkt. No. 169) at 12-13; PX 80)

Larsen testified, however, that KT "presented [its] pricing [as] a unit price per unit that [KT] manufactured for NCR," such that KT "got paid for the units that [it] produced for [NCR] and nothing else. . . ." (Dec. 21, 2018 Tr. (Dkt. No. 165) at 72) Neither side offered evidence as to discussions and negotiations regarding KT's pricing, and what it covered.

Given the competing testimony, the Court instructed the jury to "consider whether NCR has made any payments already to KT for [its time, labor and expenses]," and to "subtract [any such] amount from the amount" it awarded to KT on its unfair competition claim. (Jury Charge (Dkt. No. 169) at 213-14)

As with many other issues in the case, the dispute as to what NCR's payments covered largely came down to a credibility contest between Lutz and Larsen.[19] The jury was entitled to find Larsen's account more credible.

As for the evidence supporting the $50,000 figure, the trial record contains the following: When asked to "estimate the cost to KT to produce th[e] CAD drawings for the Version 2 SS90," Larsen stated that "[t]he cost would be around 50,000 U.S. dollars." (Dec. 21, 2018 Tr. (Dkt. No. 165) at 76) Larsen explained that this sum covered "the time and effort that we pay our engineer for, the time and labor that we use on the conversations that we have, whether they are email exchanges, telephone calls, meetings, trips to China and back, the updates that we had to include which were several and many over a period of time." Larsen estimated that, in connection with the Version 2 kiosk, KT personnel participated in about 200 meetings, amounting to over 1,000 hours, and sent about 2000 e-mails. (Id. at 76-77) As the head of KT, Larsen was in the best position to understand the cost of "the time and effort [KT] pay[s] [its] engineer for," and "the time and labor" involved in participating in hundreds of meetings and in sending thousands of emails conversations." The Court cannot conclude that "there is such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture." Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp., 136 F.3d 276, 288 (2d Cir. 1998). Accordingly, this Court will not disturb the jury's $50,000 award on KT's unfair competition claim.

---

[19] The purchase order description cited by Lutz is of limited value. There is no evidence as to (1) who created the purchase order description; (2) whether that person was knowledgeable about the dealings between NCR and KT; (3) the factual basis for the description set forth in the purchase order; (4) whether KT knew of or agreed with the classification of the payment; or (5) why the purchase order is for $20,000. (Jan. 3, 2019 Tr. (Dkt. No. 169) at 12-13; PX 80)

## CONCLUSION

For the reasons stated above, Defendant's Rule 50(b) motion (Dkt. No. 157) is

denied in its entirety. The Clerk of Court is directed to terminate the motion.

Dated: New York, New York
September 18, 2019

SO ORDERED.

Paul G. Gardephe
United States District Judge